UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TONY E. PONCE,<br><br>        Petitioner,<br><br>    v.<br><br>CHRISTIAN PFEIFFER,<br><br>        Respondent. | Case No.   1:21-cv-01727-KES-HBK (HC)<br><br>FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY [1]<br><br>FOURTEEN-DAY OBJECTION PERIOD |

## I.   STATUS

Petitioner Tony E. Ponce ("Petitioner" or "Ponce"), a state prisoner, is proceeding pro se on his Second Amended Petition for Writ of Habeas Corpus filed under 28 U. S.C. § 2254 on February 25, 2022.  (Doc. No. 12, "Petition").  Petitioner challenges his convictions following a jury trial for (1) murder in violation of Penal Code § 187(a) with a gang special circumstance pursuant to Penal Code § 190.2(a)(22) and gang and firearm enhancements pursuant to Penal Code §§ 186.22(b)(1)(C) and 12022.53(d) and (e)(1); and (2) criminal street gang conspiracy in violation of Penal Code § 182.5 with an additional firearm enhancement.  (Case No. VCF319337A).  (Doc. No. 17 at 846-47; *id.* at 215-20).[2]  The Tulare County Superior Court

---

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2022).

[2] All citations to the pleadings and record are to the page number as it appears on the Case Management

1

sentenced Petitioner to twenty-five years to life on the murder charge with an additional term of twenty-five years to life for the related firearm enhancement, and stayed the sentence on the conspiracy charge. (*Id.* at 224, 847).

On appeal, because Petitioner was only seventeen years old at the time of the offenses, the Fifth Appellate District Court conditionally reversed Petitioner's conviction and sentence and remanded the matter to the juvenile court for a determination of Petitioner's fitness for treatment within the juvenile justice system. (Case No. F074797). (Doc. No. 17 at 847, 856-57). The appellate court ordered that if Petitioner was found unfit for juvenile court treatment, the convictions were to be reinstated, and the trial court should "determine whether to exercise its discretion to strike the firearm enhancements under Senate Bill 620." (*Id.* at 856-57). On July 10, 2019, the California Supreme Court summarily denied review. (Case No. S256140). (Doc. No. 17 at 923). At a December 8, 2020 resentencing hearing, the trial court reinstated the original sentence and declined to strike the firearm enhancement. (Doc. No. 18-1).

The Petition presents a single ground for federal habeas relief: insufficient evidence to support Petitioner's murder conviction. (Doc. No. 1 at 4). Respondent filed an Answer (Doc. No. 19), arguing the sole ground for relief is without merit, and lodged the state court record in support (Doc. Nos. 17, 18, 18-1). Despite requesting and receiving multiple extensions (*see* Doc. Nos. 22 through 27), Petitioner ultimately elected not to file a reply. This matter is deemed submitted on the record before the Court. After careful review of the record and applicable law, the undersigned recommends the district court deny Petitioner relief on his Petition and decline to issue a certificate of appealability.

**II.    GOVERNING LEGAL PRINCIPLES**

**A.    Evidentiary Hearing**

In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474

---

and Electronic Case Filing ("CM/ECF") system.

(2007). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*. Petitioner did not request an evidentiary hearing. This Court independently finds that the pertinent facts of this case are fully developed in the record before the Court; thus, no evidentiary hearing is required. *Cullen v. Pinholster*, 563 U.S. 170 (2011).

### B. ADEPA General Principles

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA requires a state prisoner seeking federal habeas relief to first "exhaus[t] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). If the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on the merits, then the AEDPA mandates a deferential, rather than *de novo*, review. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016). This deferential standard, set forth in § 2254(d), permits relief on a claim adjudicated on the merits, but only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This standard is both mandatory and intentionally difficult to satisfy. *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

"Clearly established federal law" consists of the governing legal principles in the decisions of the United States Supreme Court when the state court issued its decision. *White*, 572 U.S. at 419. Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law. 28 U.S.C. § 2254(d)(1). A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the

3

1  Supreme Court when faced with materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S.
2  12, 16 (2003).

3  A state court decision involves an "unreasonable application" of the Supreme Court's
4  precedents if the state court correctly identifies the governing legal principle, but applies it to the
5  facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S.
6  133, 134 (2005), or "if the state court either unreasonably extends a legal principle from
7  [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to
8  extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362,
9  407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas
10 relief so long as fair-minded jurists could disagree on the correctness of the state court's
11 decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the
12 state court decision "was so lacking in justification that there was an error well understood and
13 comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

14 When reviewing a claim under § 2254(d), any "determination of a factual issue made by a
15 State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting
16 the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt
17 v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable
18 merely because the federal habeas court would have reached a different conclusion in the first
19 instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

20 Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any
21 constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v.
22 Abrahamson*, 507 U.S. 619, 637 (1993). As the Supreme Court explained, while the passage of
23 AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht's* actual-
24 prejudice requirement. *Brown v. Davenport*, 596 U.S. 118, 134 (2022). In other words, a habeas
25 petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 138 ("[O]ur equitable
26 precedents remain applicable 'whether or not' AEDPA applies.") (*citing Fry v. Pliler*, 551 U.S.
27 112, 121 (2007)). In short, a "federal court must deny relief to a state habeas petitioner who fails
28

4

to satisfy either [*Brecht*] or AEDPA.  But to grant relief, a court must find that the petition has cleared both tests." *Id*. at 134.

As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been an "adjudication on the merits" in state court.  An adjudication on the merits does not require that there be an opinion from the state court explaining the state court's reasoning.  *Richter*, 562 U.S. at 98.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 99.  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 99-100.  This presumption applies whether the state court fails to discuss all the claims or discusses some claims but not others.  *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision in order to apply the deferential standard. When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.  But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do." *Id*. at 1196.

### III.    RELEVANT FACTUAL BACKGROUND

The Court adopts the pertinent facts of the underlying offenses, as summarized by the California Fifth District Court of Appeal.  A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

////

## FACTUAL AND PROCEDURAL BACKGROUND

On the evening of June 12, 2015, Carlos H. was fatally shot by Augustine Isarraras in the parking lot of a market and gas station located in the community of Sultana. The shooting and events preceding it were captured on surveillance video without audio.

The video shows Ponce pumping gas into a white vehicle as another vehicle, driven by Carlos, entered the parking lot. Carlos drove past Ponce to the opposite side of the gas pump and parked parallel to Ponce's vehicle. Ponce watched as the vehicle drove past him. As Carlos exited his vehicle, Ponce knocked on the window of his own car. Isarraras and Ponce's younger brother, Abraham, exited the back seat. The victim proceeded toward the market but stopped, looking toward Ponce before eventually beginning to walk in Ponce's direction. As Carlos moved toward the group and Ponce's vehicle, Isarraras moved to the rear of the vehicle, removed a gun from his pocket, and "racked" the gun, chambering a round. Ponce was standing approximately three feet from Isarraras at that point and looking in Isarraras's direction. Meanwhile, Ponce, also near the rear of the vehicle, motioned Isarraras forward, pointing toward Carlos. Carlos backed away, but Ponce, Abraham, and Isarraras converged on him near the entrance to the market. Isarraras consulted with Ponce who nodded slightly, made a gesture toward Carlos, and backed away. Isarraras moved closer to Carlos and shot him in the chest. As Isarraras fired the weapon, Ponce made a hand motion, potentially a gang sign, and the three men then ran back to their car and left the parking lot.

Carlos died as a result of this single gunshot wound to his chest. A .32 caliber shell casing was found in the driveway in front of the market.

### I.     Ponce's Statements to Police

Ponce made two statements during interviews with Detective Rodney Klassen. The first interview took place the day after the shooting; the second was initiated by Ponce the following day.

Ponce initially denied knowing the shooter's identity and claimed the shooter came to Ponce's house to pick something up and they were merely giving him a ride home. Later, Ponce acknowledged having a long history with Isarraras's family, but claimed to have only known Isarraras for about two weeks. He stated that Isarraras went by the moniker "Capper" and was an up-and-coming gang member who wanted to be "jumped in" to the gang. Isarraras is younger than Ponce.

Ponce initially denied being a gang member himself, claiming to be only a Southern or Sureno gang associate. He later admitted he was a jumped-in member of a gang out of Los Angeles that he identified as La Puente Tracy. Ponce reported that he had been jumped by Northerners on several occasions and stated he desired to retaliate because "karma comes around." Ponce stated that his family, including both parents, was involved in gangs. Ponce was initiating

6

his brother Abraham into the gang life but Abraham was not yet a jumped-in gang member. Ponce stated Abraham follows in his footsteps.

In the second interview, Detective Klassen informed Ponce that Isarraras had confessed to being the shooter. Detective Klassen showed Ponce the surveillance video of the incident. Ponce identified himself, Isarraras, and Abraham in the video. Ponce claimed that Carlos was "mad dogging" Ponce as he drove into the gas station. Ponce tapped on the car window to get Abraham's and Isarraras's attention so they would exit the car.

At the point in the video where Carlos stopped walking toward the market and turned to face Ponce, Ponce claimed to have said, "What's up homie," and "Why are you disrespecting me?" to Carlos. Ponce believed Carlos wanted to fight, and Ponce likewise wanted to fight Carlos for challenging or disrespecting him. Carlos then asked if Ponce was a gang banger, to which Ponce replied, "Yes, but my family is here." As Ponce backed away from Carlos, Ponce told Abraham and Isarraras, "Let's jump him."

Ponce claimed he did not see the gun until the group converged on Carlos near the market entrance. Ponce claimed that, at that point, Isarraras asked Ponce whether "he should do it" and Ponce told him, "no, put that away."

In his first interview, Ponce stated that he blacked out prior to Isarraras firing upon Carlos. Detective Klassen told Ponce that was strange because Abraham also reported he "blacked out" at the same point. Ponce responded that they both blacked out and they both have bipolar disorder and schizophrenia. Ponce later admitted his story about blacking out was "BS."

Ponce knew before the shooting that Isarraras had a gun in his right pocket. At one point, Ponce stated that he was present when the driver of a van gave Isarraras the gun. At another point, Ponce stated that Isarraras approached him in a bragging way, showed him the gun, and stated he would have to return it that same day. After the shooting, Ponce saw Isarraras give the gun, which was wrapped in a blue rag, to the driver of the van that came to Ponce's residence to pick up Isarraras. Ponce described the gun as a small silver .32 caliber handgun.

**II.   Eyewitness Testimony**

An eyewitness present at the market at the time of the shooting recalled Carlos stating he "did not want any problems." Thereafter Carlos said, he didn't see a way out, and so he said, okay, we're going to fight." Then, "they shot him." She also heard another man ask "[w]hy had he looked at them when they were filling the tank with gas." She did not see any weapons in the victim's hands.

**III.   Gang Evidence**

Extensive evidence was presented at trial to establish that Ponce is a

7

member of the Sureno or Southern criminal street gang. Additionally, Detective Neil Skrinde testified as an expert in gang activities and culture. He explained that getting into a gang requires "putting in work," either by committing crimes for the benefit of the gang, being jumped in, or having some other "body of work" that shows allegiance to the gang. Criminal activity can also raise a gang member's status within the gang, and more heinous crimes result in higher status.

Northerners and Southerners are gang rivals. Sultana is in Northern gang territory, and the presence of rival gang members in that territory is a sign of disrespect to that gang.

The phrase, "What's up" is used by gang members to challenge a rival to a fight. The phrase, "What do you bang" is used to determine whether someone is a Northern or a Southerner. The phrases, "Why were you looking at me" and "Where are you from?" are similar phrases used as a way of "hitting up" a potential rival.

Gang members want to control territory and be the strongest gang in that territory. Gangs exert control by using respect or fear to control their rivals and other citizens. Gang members may intentionally disrespect a rival gang by going into another's territory or committing a crime against a rival. Gang members must respond to disrespect from a rival or be considered weak.

When gang members are involved in a group assault, they have a duty to "back their homie." A gang member who did not participate with others in a crime or who withdrew from the crime would be perceived as a coward. A gang member would not discourage another gang member from committing a crime.

Gang members carry guns to assert power and authority, as a form of protection, and as a status symbol. A gang member will generally announce to fellow gang members that he is holding a gun so others will know who is armed in the event of an attack or a law enforcement contact.

Detective Skrinde explained that the type of staring exhibited in the surveillance video here would be considered a challenge. Neither the person pumping gas nor the driver of the other vehicle could back down from the confrontation. Once confronted by a rival, the three individuals (Ponce, Abraham, and Isarraras) could not retreat. However, those who were unarmed could step back and permit the armed individual to "take care of business." Detective Skrinde described the gestures made by Ponce in the video as "calling [Isarraras] up" or directing him. If a higher-ranking gang member told someone lower in the hierarchy not to shoot, that person would not shoot. However, the higher-ranking gang member could face consequences for appearing weak.

(Doc. No. 17 at 847-52 (footnotes omitted)).

////

## IV. ANALYSIS

Respondent acknowledges that Petitioner's single ground for relief was raised on direct appeal to the Fifth Appellate District Court, denied on the merits (Doc. No. 17 at 846-57), then subsequently raised, and summarily denied by the California Supreme Court (*Id.* at 923). Thus, the sole ground is exhausted, and the Court looks to the Fifth Appellate District's reasoned decision in evaluating each of Petitioner's claims under the deferential standard of review. *Wilson*, 138 S. Ct. at 1192.

### A. State Court Decision

In denying Petitioner's insufficiency claim, the Fifth Appellate District court found as follows:

> **I. Sufficiency of the Evidence**
>
> Ponce was not the shooter, and he was convicted of first degree murder under a theory of direct aider and abettor liability. Ponce contends there is insufficient evidence he knew of Isarraras's plan to commit murder or acted with intent to facilitate that offense, as required to support his conviction for first degree murder under this theory. We disagree.
>
> In reviewing the sufficiency of the evidence, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence-that is, evidence that is reasonable, credible, and of solid value-from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People* v. *Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People* v. *Medina* (2009) 46 Cal.4th 913, 919.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*Cravens,* 53 Cal.4th at p. 508.) The standard of review is the same in cases in which a conviction is based primarily on circumstantial evidence. (*People* v. *Clark* (2016) 63 Cal.4th 522, 625.)
>
> First degree murder involves a killing that is willful, deliberate, and premeditated. (§ 189; *People* v. *Villegas* (2001) 92 Cal.App.4th 1217, 1223-1224.) "Premeditated" means the defendant thought about or considered the act beforehand. (*People* v. *Pearson* (2013) 56 Cal.4th 393, 443 (*Pearson*); *People* v. *Perez* (1992) 2 Cal.4th 1117, 1123 (*Perez*).) *"*Deliberate" means " 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " (*Perez,* at p. 1123.) " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and

9

reflection rather than unconsidered or rash impulse.' " (*Pearson,* at p. 443.) Premeditation and deliberation can occur rapidly. (*People v. Cook* (2006) 39 Cal.4th 566, 603-604 (*Cook*); *People v. Thomas* (1945) 25 Cal.2d 880, 900 (*Thomas*).) "The true test is not the duration of time as much as it is the extent of the reflection." (*Thomas,* at p. 900.)

A conviction for first degree murder under a direct aider and abettor theory of liability requires a showing that the defendant "aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*People v. Chiu* (2014) 59 Cal.4th 155, 167 (*Chiu*).) In other words, the aider and abettor "must know and share the murderous intent of the actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) "An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent." (*Chiu,* at p. 167.) Intent to kill may be inferred from the defendant's acts and the circumstances of the crime. (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

Here, substantial evidence supports a finding that Ponce knowingly and intentionally aided and abetted Isarraras's commission of premeditated and deliberate murder. Ponce, a Southern gang member, told police he had been jumped by rival Northern gang members and wished to retaliate. He rode with two younger juveniles, one of whom Ponce knew to be armed, into rival Norteno territory. Both juveniles were being indoctrinated into the gang lifestyle. Ponce visually challenged Carlos then tapped on his own car window to signal Abraham and Isarraras to get out. As Isarraras racked his gun, Ponce motioned Isarraras forward with his left hand and pointed at Carlos with his right. After Ponce and his companions converged on Carlos, Isarraras consulted briefly with Ponce, and Ponce made a slight nod and gesture toward Carlos before backing away. Isarraras immediately proceeded forward and shot Carlos. The People's expert testified that a higher-ranking gang member would encourage, rather than discourage, a lower-ranking member to shoot a rival, particularly once the gun had been presented. Based on this evidence, a reasonable juror could determine that Ponce shared Isarraras's intent to kill Carlos, a perceived rival.

There is a modicum of evidence to suggest Ponce was unaware of or did not share in Isarraras's intent: Ponce claimed not to have seen Isarraras initially draw his weapon and claimed to discourage the shooting once he became aware of Isarraras's intent. Video evidence, however, shows Ponce looking in Isarraras's direction as the gun is drawn, and gesturing Isarraras toward Carlos both at that moment and, subsequently, when Ponce claims Isarraras asked if he should shoot. It was for the jury to determine from this evidence whether Ponce's claimed efforts to discourage the shooting were credible. In contrast, our duty on appeal is to determine only whether a reasonable trier of fact could find defendant guilty beyond a reasonable doubt, not to determine whether the facts

10

> might also support a contrary finding. (*People* v. *Alexander* (2010) 49 Cal.4th 846, 917.) While the jury could have relied on Ponce's denials to find Ponce not guilty, it did not do so. Substantial evidence supports the jury's finding of guilt.
>
> Ponce also claims the incident was too brief to suggest premeditation or deliberation. As stated, premeditation and deliberation can occur rapidly. (*Cook, supra,* 39 Cal.4th at pp. 603-604; *Thomas, supra, 25* Cal.2d at p. 900.) The brevity of the event does not negate a finding of premeditation, particularly in light of Ponce's actions. Ponce's decision to travel with an armed associate into rival gang territory and his stated desire to seek retaliation, combined with his conduct as reflected on video surveillance, are sufficient evidence upon which a jury could base a finding of premeditation.

(Doc. No. 17 at 852-54).

### B.     Federal Habeas Analysis

As an initial matter, to the extent Petitioner asserts he is entitled to resentencing under Penal Code § 1170.95,[3] such is a state law issue that cannot be the basis of federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *see Muhammad v. Matteson*, No. 2:23-CV-2517-DAD-DMC-P, 2024 WL 3792394, at *2 (E.D. Cal. Aug. 13, 2024) *report & recommendation adopted*, 2024 WL 4729409 (E.D. Cal. Nov. 8, 2024) ("As numerous other federal courts have concluded, challenges to a denial of resentencing under § 1170.95 do not present a federal question.") (collecting cases). Thus, the Court addresses Petitioner's federal habeas claim that there was insufficient evidence to support his conviction.

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The federal standard for determining the sufficiency of the evidence to support a jury finding is set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original); *see also Coleman v. Johnson*, 566 U.S. 650, 656 (2012) ("the only question under

---

[3] *See* Doc. No. 12 at 5-6, raising a resentencing argument based on Penal Code § 1170.95.

*Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality"); *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (a reviewing court "may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury").

The *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16; *Juan H. v. Allen*, 408 F.3d 1262, 1275-76 (9th Cir. 2005). The reviewing court should look to state law for the elements of the offense and then turn to the federal question of whether any rational trier of fact could have found the essential elements of the crime supported by sufficient evidence beyond a reasonable doubt. *See Johnson v. Montgomery*, 899 F.3d 1052, 1056 (9th Cir. 2018).

Further, when both *Jackson* and AEDPA apply to the same claim, the claim is reviewed under a "twice-deferential standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012). As noted by the Supreme Court:

> First, on direct appeal, "it is the responsibility of the jury−not the court−to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

*Coleman*, 566 U.S. at 651.

California law defines murder as "the unlawful killing of a human being, or a fetus, with malice aforethought" and requires an additional finding that the killing was "willful, deliberate, and premeditated" for it to be set as first degree murder. Cal. Penal Code §§ 187(a), 189(a). Under California law, "a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." *People v. McCoy*, 25 Cal. 4th 1111, 1117 (2001). "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids,

promotes, encourages or instigates, the commission of the crime." *People v. Beeman*, 35 Cal. 3d 547, 561 (1984).

Here, the state appellate court, although not citing to *Jackson*, applied the same test and determined there was sufficient evidence to support the Petitioner's conviction of first degree murder based on an aiding and abetting theory. In making his argument for habeas relief, Petitioner references Senate Bill 1437, "which narrowed or eliminated certain forms of accomplice liability for murder." *People v. Curiel*, 15 Cal. 5th 433, 440 (2023). As the California Supreme Court explained:

> Senate Bill 1437 amended the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.

*Id.* However, Petitioner's reliance on Senate Bill No. 1437 does not establish his entitlement to federal habeas relief because the state appellate court's opinion specifically found that "a reasonable juror could determine that Ponce shared Isarraras's *intent to kill Carlos*, a perceived rival." (Doc. No. 17 at 854) (emphasis added). Thus, the state court's decision was consistent with the altered requirements set forth in Senate Bill 1437.

Other than arguing in conclusory terms that the evidence was insufficient, Petitioner does not explain how the state court's rejection of Petitioner's sufficiency of the evidence claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See generally* Doc. No. 12. Other than arguing that the surveillance did not contain audio, Petitioner does claim that the state court's factual findings court were unreasonable.

A review of the record reveals that sufficient trial evidence supported Petitioner's conviction. Multiple witnesses testified regarding Petitioner's gang membership and Abraham's and Isarraras's desire to become gang members. (Doc. No. 17 at 430-37, 443, 453, 497, 511, 545-48). The gang expert testified regarding joining a gang, explaining that an individual would have to commit criminal acts and potentially have a sponsor within the gang. (*Id.*). Perhaps most critically, multiple surveillance videos captured the shooting. The undersigned has reviewed the

13

surveillance video and it shows Petitioner, Abraham, and Isarraras walking out of the store to their vehicle, with Petitioner staying outside the vehicle to pump gas while Abraham and Isarraras get inside. After the victim pulls into the gas station, Petitioner knocks on the window of his vehicle and Abraham and Isarraras exit the vehicle while Petitioner and the victim begin an exchange. Isarraras removes a gun from his pants and Petitioner motions toward the victim, who begins to retreat. Petitioner, Abraham, and Isarraras rush towards the victim, with Isarraras in the middle and Petitioner to his left. Isarraras looks at Petitioner, who nods and gestures towards the victim before backing away. Isarraras then shoots the victim, and all three participants flee the scene. While Petitioner argues the lack of audio on the surveillance video "creates a significant hole within the evidence" because there was "no evidence of what was said between the victim and the defendant during and or after the incident took place," it was the responsibility of the jury to decide what conclusions should be drawn from the evidence presented. *Cavazos*, 565 U.S. at 2; *United States v. Nevils*, 598 F.3d 1158, 1170 (9th Cir. 2010) (in assessing sufficiency of the evidence claim, it is not the court's function to reweigh the evidence).

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Petitioner knew Isarraras planned to kill the victim and encouraged him to do so with the requisite malice, premeditation, and deliberation. As such, the state court's rejection of Petitioner's sufficiency of the evidence claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts. The undersigned recommends that the Petition be denied.

### V. CERTIFICATE OF APPEALABIILTY

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing § 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial

showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because Petitioner has not made a substantial showing of the denial of a constitutional right, the undersigned recommends that the court decline to issue a certificate of appealability.

    Accordingly, it is **RECOMMENDED**:

1. Petitioner be DENIED all relief on his Second Amended Petition for Writ of Habeas Corpus (Doc. No. 12); and

2. Petitioner be denied a certificate of appealability.

## NOTICE TO PARTIES

    These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with a copy of these Findings and Recommendations, a party may file written objections with the Court. *Id*.; Local Rule 304(b). The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen (15) pages**. The Court will not consider exhibits attached to the Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity. Any pages filed in excess of the fifteen (15) page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C). A party's failure to file any objections within the specified time may result in the waiver of certain rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

Dated:   February 24, 2025

                                          HELENA M. BARCH-KUCHTA
                                          UNITED STATES MAGISTRATE JUDGE